GEORGE B. BEATTY et al., executors,

v.

THE TRUSTEES OF THE CORY UNIVERSALIST SOCIETY et al.

---

THE TRUSTEES OF THE CORY UNIVERSALIST SOCIETY AT SPARTA.

v.

GEORGE B. BEATTY et al., executors.

1. Legatees mentioned in a will by the nicknames by which testator always called them, and identified, were held entitled to their respective legacies.

2. A provision that in case of the death of a certain legatee before majority, the legacy was "to revert back to" testator's "other lawful heirs," construed to mean that, in that event, the legacy should go to his children or their representatives.

3. Where executors filed a final account, charging themselves with a certain amount, the fact that a part of that amount consisted of securities, which they then supposed were good, but which they afterwards failed to collect, is not a mistake, for which they can obtain relief in equity six years thereafter, and especially so where the will directed the greater part of the legacies to be paid with the securities received by the executors from the testator, and some of those securities have been lost through the executors' delay and blunders in their attempts to collect them.

4. Executors' reasonable expenses of a suit in this court for the construction of the will, allowed, but not those in the court of appeals in the same case, the appeal therein having been taken by them, and being deemed unnecessary under the circumstances.

5. Executors, who instituted proceedings to be relieved from the amount charged against them in their final account, and who were refused relief therefrom, held liable to pay the costs of the suit, although they also asked incidentally for a construction of the will by the same bill.

---

Bills for relief.   On final hearing on pleadings and proofs.

*Mr. Thomas Kays*, for the executors.

*Mr. E. Q. Keasbey,* for the trustees.

*Mr. C. J. Roe,* for Frank Roe and others.

THE CHANCELLOR.

David Cory, deceased, late of Sparta, in Sussex county, died October 14th, 1870, leaving a will dated January 1st, 1869, and a codicil thereto dated the 17th of February following. By the will he appointed his friends, George B. Beatty and James L. Munson, and his grandson, Francis C. Easton, executors, and by the codicil he appointed his son, Job Cory, an executor also. All the executors proved the will and codicil October 25th, 1870, and straightway entered upon the duties of their office, and have continued to act as executors ever since. On the same day on which the will was proved, they filed an inventory of the estate, by which it appeared that there had come to their hands, as executors, personal property to the value, as appraised, of $108,111.92, of which sum $2,196.51 were the appraised value of farm-stock, grain &c., and $492.15 the value of household goods, and the rest, $105,423.27, was the value of cash and securities for the payment of money. In this last amount was included the amount ($1,439.29) of principal and interest of certain claims which were set down in the inventory as being doubtful. They were a note of Alfred Ackerson, and four notes made by J. B. Boss, but no other claims were so designated. So that according to the inventory, there came to their hands, on the death of the testator, cash and securities, considered by themselves and the appraisers to be good and collectible, to the amount of $103,983.98.

By the will the testator gave to his wife, for life (in lieu of dower), his homestead farm, together with all the stock and movable property, including household furniture, but not notes or bonds and mortgages. To his grandson, Francis C. Easton, he then gave the farm (except a lot of about nine acres), for life, with remainder to the heirs of his body lawfully begotten, and gave the lot of nine acres, after his wife's death, to his, the testator's, son Job, in fee. He then declared it to be his will, and

ordered that Francis C. Easton should have all the before-men-
tioned movable property (except household goods) on or belong-
ing to the farm, and the blacksmith's tools, after his wife's death;
and he then ordered and directed that Easton pay, to his execu-
tors or their successors, $3,000 after the decease of his wife (with
interest), and within five years after he should have taken pos-
session, which money he declared should be a lien on all the
property until paid, and when paid the property was to be
Easton's absolutely. He further ordered that after his decease,
or the death of his wife, as the case might be, the movables given
to Easton should be at Easton's disposal, on his paying $1,500.
The will declared that the gifts to Easton were upon the
express condition that he should make no charge against the
testator's estate for labor done, or services rendered to or for the
testator during the testator's life, or that of his wife. The
testator then gave to his son Job the farm called the Cox
farm, on which the latter then lived, together with $12,000
in notes, bonds and mortgages; the securities to be such as the
executors should assign and deliver over to him. Then followed
certain other bequests, viz. : To the testator's son, Thomas Cory,
"and to his heirs," $20,000 ; to the testator's daughter, "Mar-
thy" Morrow, "and to her children," $20,000; to his son,
Charles Cory, $4,000 ; to his daughter, Jane Easton, $5,000,
"and after her decease to her children ;" to his granddaughters,
Martha and Mary Easton, each $500; to his granddaughter
"Sharlotty" Cory, daughter of his deceased son Samuel, $1,000,
and to his two grandsons, Zophar and Samuel Cory, each $1,000.
He then gave to his three grandchildren, George, Francis and
"Sharlotty," children of his deceased daughter, Eliza Roe,
$12,000, in equal shares, when they should arrive at the age of
twenty-one years, and added—

"And further, I order that if any one of them should die before that time,
then his or her share to go to the living; the last of these legacies named to
remain in the hands of my executors or guardians appointed for that purpose,
and be kept at interest for them until they shall arrive at the age above de-
scribed."

He then gave to his granddaughter, "Caty" Roe, daughter of

his deceased daughter, Mary Roe, $1,000, to be retained in the hands of his executors, or "their survivors," until she should arrive at the age of twenty-one years; and he added—

"But if she should die before that time, or die without issue, then and in that case that the legacy bequeathed to her revert back to my other lawful heirs."

Then followed a bequest of $1,500, in equal shares to his three grandsons, Francis, William and "Yeany," sons of his son Job, when they should arrive at the age of twenty-one years, and the will adds, "to be kept at interest for them by guardians appointed for that purpose." After directing the sale of a wood-lot, the testator then directed as follows:

"It is my will, and I do order that all the above-stipulated legacies and bequests to be paid by my executors, or their survivors of them, to the above-named legatees, in notes, or bonds and mortgages transferred to them with the respective value at the time, by my executors or the survivors of them, excepting those that are not of age, as stated above; and if there shall be an overplus after paying the stipulated legacies and debts, then I order that what remains to be paid or distributed to my lawful heirs."

After giving his wife leave to sell or dispose of the household goods as she should think best, he ordered his executors, or the survivors or survivor of them, to retain in their hands $12,000, for the purpose of a trust to erect a building and establish a religious society. The trust was modified by the codicil so as not to require the erection of the building, but directing the payment of the money to certain persons in the codicil named after they should have established the society, and should have been incorporated to carry the object of the trust into effect. The codicil confirmed the will, except as to part of the trust, which it merely modified, and appointed Job Cory an executor.

As appears by the records of the orphans court of Sussex county, the joint final account of the executors was passed at the term of December, 1871, whereby they were charged with $117,-531.48, and after crediting them not only with moneys paid, including legacies, but also with all legacies remaining unpaid and

their commissions and expenses of settling the account, there was a balance in their hands of $6,299.93. In September, 1873, "The Trustees of the Cory Universalist Society at Sparta" filed their bill in this court to compel payment to them of the legacy of $12,000 due to them under the will, with the interest thereon. George B. Beatty and James L. Munson, two of the executors, answered together, and the other two executors also answered together. The answers were filed in November, 1873, and both of them, although they denied the validity of the bequest, admitted that there were sufficient assets in the hands of the executors to pay the demand if the legacy should be established. It was established by decree of this court made in March, 1878. From that decree the executors appealed, and it was affirmed by the court of last resort at the term of November, 1879. By the decree, the executors were permitted to amend their answer by striking out the admission of assets and setting up deficiency thereof, but they having suggested that they could safely pay to the trustees $3,000 on account of the legacy, it was ordered that they pay that sum accordingly, which was done. In May, 1878, they filed the bill in this cause for the construction of the will and for relief against the final account before mentioned. The latter branch will be first considered. The relief on that head is sought on the ground of mistake. The executors allege that the account (it is the only one they ever filed) was never intended to be the account of all of them, but only the account of two, Beatty and Easton, and that as such it was not intended to be final but only intermediate. The testimony of the surrogate, by whom the account was drawn up, and who gave the requisite notice for the executors, is very clear and positive on the subject. He swears that the executors were all present at the making out of the account, and that they agreed to have the account stated as a joint account, and he says he thinks he explained to them the difference between joint and separate accounts, as to their effect upon the accountants. He also testifies that Beatty, Munson and Cory, and he thinks Easton also, had been to his office previously to see him on the subject, and that they all appeared anxious to have the estate settled up; that he

saw the vouchers and that the balance was struck in the presence of the executors. That all of them knew that the account had been passed soon after it was done is evident from the fact that they divided among themselves the $2,382.03 of commissions allowed them in the account. Their testimony is not such as to overcome that of the surrogate. He is an impartial witness. He was acting in a *quasi* official capacity in making up the account for them. He had no interest to subserve by deceiving them, and it does not appear that he did so. The fact that the account covers the transactions of all the executors is a circumstance of much weight against them on this point. It is enough to say that the account purports to be the joint account of the four, and it appears to have been filed, audited, stated, reported for settlement and passed as such many years (more than six) before the filing of their bill, and, as before stated, neither they, nor any of them, ever filed any other account. It must stand and be accepted here as and for what it purports to be, with all its consequences, unless fraud or mistake is shown. It is to be observed that it is not attacked by any legatee or distributee, but it is the executors themselves who are seeking to relieve themselves of the legal consequences of their own act. Inasmuch as the evidence does not establish the fact that they were induced by fraud to settle the account as a joint account, or to charge themselves therein with anything with which they ought not to have charged themselves, they must rely upon mistake—their own mistake—as the ground of relief. Now in what did the alleged mistake consist? To a great extent, in charging themselves with the amount of securities which they had not collected and which they then supposed to be good, but which they subsequently failed to collect. That, however, is not a mistake for which relief will be granted in such a case. *Voorhees* v. *Voorhees's Executors, 3 C. E. Gr. 223, 228.*

It may be imprudent for an executor so to make himself liable in his own estate for the amount of securities of the estate. It may be unwise for him thus to assume the risk of collection, but that is a matter which concerns himself alone and of which he himself must be the judge. If for any reason, or for none at

all, he does thus become a guarantor to the estate, it is obvious that he thereby releases the creditors and legatees or distributees from any further anxiety on the subject of the collectibility of the securities and the necessity of any further attention to the matter. They may properly regard the securities as already collected. Especially is this so where, as in the case in hand, the account has stood for many years before the executor takes any step to correct it or release himself from liability thereunder. But it is quite evident that the executors in this case voluntarily charged themselves with the securities. All those with which they charged themselves were believed to be good. Easton says they had but two classes of securities—those which they considered good and those which they considered uncollectible—and that there were none between those grades. They did not charge themselves without discrimination, but sought and obtained allowance in the account for such securities as they believed to be doubtful or uncollectible, asking and obtaining allowance not only for the amounts of the notes which, in the inventory, were put down as doubtful, but also for eight others which were in the inventory but not marked doubtful, and which had proved to be uncollectible. But if the application for relief could be entertained, on the ground that the executors erred in judgment in unnecessarily incurring liability, the circumstances of the case would forbid and prevent its success. The will directed that the legacies of the adult legatees, except the trustees, should be paid in the securities which the executors received from the testator. There was no good reason for not making such payments within the year succeeding the admission of the will to probate. The true value of all the securities could have been ascertained without difficulty within that period. Although some of them greatly depreciated after that time, it was not until the great depression in the market value of real estate, and that did not begin until the fall of the year 1873, three years after the filing of the inventory. There is great reason to believe that the Ingersoll mortgage (for $4,000) was good, and could have been collected in 1871, but it was not until 1874 that steps were taken to collect it, and then the property had depreciated in market

value very much.   When it was put up for sale under the foreclosure proceedings instituted by the executors, a bid of about $1,100 was made by another person, but the executors declined to let it go at that price, and bought it in.   It was subject to a prior mortgage for over $3,700.   After the purchase, and before the sheriff's deed was delivered, the barn on the premises was burned.   The executors built a new one.   They sold the property in 1878, for $600.   On this transaction of the purchase of the farm, taking into the account the moneys subsequently expended upon the property by the executors in building the barn and for interest on the prior mortgage, there was a loss of about $3,300 in addition to the loss of the claim itself; that is, the estate thus lost altogether, including interest on the mortgage held by the estate, about $8,500, while the executors themselves admit that the mortgage was worth $2,000 in November, 1871, and there is great reason to believe that it was then entirely collectible.   The interest was paid April 1st, 1873, and had been paid up to that time.   The amount of the Hughes mortgage was, it would seem, also lost through delay.   The property was sold under forelosure of the first mortgages in 1874, and then brought only $3,000, or thereabouts, the amount of the decree upon those mortgages.   But in 1871 and 1872 it probably would have brought more.   Mr. Stanaback swears that it was worth more in those years than it was in 1874, and besides he says he thinks that there was an accumulation of interest at the latter date on the mortgages prior to that held by the Cory estate.   He also says he thinks that in 1871 or 1872 it was worth about $40 an acre.   There were, he says, about ninety-three acres in it, or a little over.   So that it was worth in those years about $3,700.

And here reference may be made to the Snyder claim, which was lost after the filing of the account.   In 1873 the executors held two notes for $1,000 each, given by Jacob Couse to the testator.   On one of them Peter Dennis was surety, and on the other John Snyder.   On the 1st of April, 1873, $1,070 principal and interest were paid to Easton on account of those claims.   On receipt of that money he delivered up the former note on which the payment was made, and endorsed a payment

of $1,000 on the other. Suit at law was subsequently brought by the executors on the latter note, which resulted in defeat. It is almost too obvious for remark that no allowance can be had in respect to that claim, lost, as it was, by a blunder of one of the executors. At the time of the filing of the account the claim was good, for aught that appears. The executors are entitled to no allowance in respect to any of these claims—the Ingersoll, Hughes and Snyder claims. According to their own statement in their bill, as to what the actual condition of the estate in their hands was in November, 1871, the date of filing the account, there was, allowing their estimate of $2000 for the expenses of closing up the settlement of the estate, in addition to commissions to the amount of $2,242.83, a deficiency of only $1,752.07. But this result is due to their claim of allowance of $4,886.84 for doubtful obligations, of which amount $2,000 are claimed for the Ingersoll mortgage, and $507.20 for the Hughes mortgage. If these be not allowed, the account will show a surplus of $755.13, allowing $2,000 for expenses of settling the estate over and above commissions, or $2,755.13 if that sum be not allowed. To this is to be added the sum of $3,000 with the interest thereon due to the estate from Frank C. Easton, for the charge upon property bequeathed to him. In the account, in the executors' bill of complaint, allowance is made for all mistakes in the amount of principal and interest due on securities in making up the inventory (and the difference on that head between the account in the bill and the account passed, is by no means great), and for the full amount of a mortgage of Alfred Roof, put down in the inventory as good, and carried (as part of the inventory) into the account passed in the orphans court. That mortgage was in suit at the testator's death, and from it nothing over and above the expenses of litigation was, in fact, realized to the estate. The account of November, 1871, represented the amount of the estate then in the hands of the executors, as they then understood it. It shows a balance of over $6,000 after paying all debts and legacies. There was a mistake of $1,000 in it in favor of the executors, a credit on account of a supposed error in the amount of the

principal of the Carr mortgage. The account in the bill shows, as before stated, a deficiency of $1,752.07, but it allows $4,886.84 for " doubtful obligations," and $2,000 (in addition to commissions) for expenses of closing up the settlement of the estate; altogether, $6,886.84. If those " doubtful obligations " and the $2,000 for estimated future expenses be not allowed, the balance against the executors would be $656.91 more than that shown by the account passed. Of those so-called doubtful obligations, the amount of the Roof mortgage, $2,343.36, alone should be allowed. Although about $780 were collected on that mortgage, the amount appears to have been spent in counsel fees and disbursements in the suit upon and in reference to it. The credit for errors (in addition to those allowed in the account in the orphans court) in the computation of interest on some of the items in the inventory should also be allowed, and, on the other hand, the credit for errors in the inventory as to the Carr mortgage should be struck out. The amount of the Rogers debt, in the account, should be increased from $418.58 to $522.59, and $13.09 should be allowed for a debt of Rogers and Kays; $6.50 for a debt of Samuel Ellet, and $26.84 for a debt of John L. Riker.

There should be an allowance also for the reasonable expenses in this court of the suit instituted by the trustees against the executors. But there should be no allowance for any costs or expenses of that suit in the court of last resort. The decree of this court would have protected the executors. It was not necessary for them to take an appeal. There is some evidence that the appeal was due to a disposition on the part of one of the executors at least, to litigate in the hope of defeating the trustees. Beatty, who was averse to the litigation, testifies that Job Cory said " he never meant to pay that legacy, if he could help it," and that " he never expected to pay it." But, however that may be, the appeal was not necessary to the protection of the executors, and therefore the estate should not pay the expense of it. The costs of endeavors to collect claims (except as to the Roof mortgage) after the account in the orphans court was passed, will not be allowed. That account must stand, except so far as it is

varied by the correction of the mistakes before mentioned. The executors should be required to pay interest for the balances in their hands respectively. They ought to have settled the estate within the year following the probate of the will. The settlement would have been attended with but little trouble. The great body of the legacies was to be paid by transfer of securities, and the debts were but few. If there have been depreciation and loss, they are due to the failure of the executors to their duty in the settlement of the estate.

Their bill asks for construction of the will and for instructions as to their duty in certain respects. Those matters will be now considered. And first as to the question whether, under the sixth clause, Easton is chargeable with interest on the $3,000 thereby made payable, and, if so, from what time, and when it is due. The will expressly provides that he shall pay interest. He was to pay the $3,000 in five years after taking possession. He took possession on the death of the widow, August 6th, 1876. The interest ran from that day, and both principal and interest were payable at the end of five years from that time. He is chargeable with lawful interest upon the interest (with annual rests) from August 6th, 1881.

In the sixteenth clause of the will, a legacy is given to persons whom the testator designates as George, Francis and "Sharlotty," the children of his deceased daughter, Eliza Roe. There can be no doubt, from the evidence, that by "Sharlotty" he meant Mattie C. Roe, the only daughter of Eliza. He was in the habit of calling her by the name of "Charlotty."

Under that clause, her share, in case she should die before attaining to majority, will go to her surviving brothers. The language is—

"If any one of them should die before that time [majority] then his or her share to go [to] the living."

By the seventeenth clause, the testator provided that in case of the death of the legatee therein named, Catharine Roe, before attaining to her majority, or in case she should die without issue,

then the legacy given to her is to "revert back to" his "other lawful heirs."

The question propounded is, What is meant by the provision that it shall revert back to his lawful heirs? By the term "revert" he meant "go to," and by "lawful heirs" he meant his children, or, in case of their death, those who should legally represent them.

In the nineteenth clause a legacy is given to his three grandsons, Francis, William and "Yeany," sons of his son Job. By "Yeany" he meant Job's son Eugene, whom he habitually called by the nickname of "Yeany."

The twenty-first clause is as follows:

"It is my will, and I do order, that all the above stipulated legacies and bequests to be paid by my executors, or the survivors of them, to the above-named legatees in notes or bonds and mortgages transferred to them with the respective value at the time by my executors or the survivors of them, excepting those that are not of age as stated above; and if there shall be an overplus after paying the stipulated legacies and debts, then I order that what remains to be paid or distributed to my lawful heirs."

This is a provision for payment of those legacies to the adult legatees in notes or bonds and mortgages belonging to the testator at the time of his death. He directs that the selection be made by his executors, and that the value at which the securities shall be taken by the legatees shall be the amount due upon them at the time of transfer. The transfer has, in fact, been made to all of the adult legatees whom the executors have not paid in cash. By the concluding provision of the section the testator meant to give any surplus which should remain (there is no residuary clause in the will or codicil) after payment of debts and legacies to his children, or in case of their death, to those who should legally represent them.

The legacies to those adult legatees are demonstrative legacies, for they are to be paid out of certain designated securities. But the testator did not intend that they should, by reason of that fact, have a preference, in any way, over the other legacies. He directs that the legacy given to his three grandchildren, George, Francis and Charlotte Roe, "remain" in the hands of his execu-

tors or guardians to be appointed for the purpose of taking charge of the money, and be kept at interest for the infants until they shall have attained to their majority. He directs that the legacy to Katy Roe be "retained" in the hands of his executors and kept at interest for her until she shall attain to the age of twenty-one years. He also directs his executors to retain $12,000 in their hands for the church legacy. He did not intend that the adult legatees, who were to be paid in securities, should have a preference over the others, but, on the contrary, while he presumed and believed that there would be quite enough to pay all in full, he, in effect, directed his executors to retain—withhold from the assets—certain sums of money for the infant legatees and the church. So far from those adult legatees being entitled to a preference over the infant legatees and the church, the infants and the church are rather entitled to priority over them. The legacies, however, are all to be considered as general legacies, and therefore liable to abate proportionately. Hence, in case of a deficiency of assets, the adult legatees who have been paid in full, would be bound to contribute to the payment of the legacies to the infants and the church.

This question of contribution is of no importance. The executors are chargeable with all the unpaid legacies in full, with interest thereon.

The question whether the devisees can also be compelled to contribute is asked. The legacies are not charged on the land. There is, therefore, no liability on the part of the devisees to contribute to the payment of the legacies.

By far the greater part of the litigation has been in their own behalf to relieve themselves from the liability incurred by the filing of the account in the orphans court. Had they been successful in that matter, it would have been just that they pay costs. The questions of construction which are raised are, some of them, unimportant, and all of them are raised at so late a day and under circumstances so unfavorable to the executors, that they must be held not to be entitled to costs as to them, but, on the contrary, they should pay the costs of the suit; notwithstanding the fact that they have asked for a construction of the will as part of the relief.